IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JEFFREY LEPSCH,

                 Petitioner,                 REPORT AND

     v.                                    RECOMMENDATION

WILLIAM POLLARD, Warden,                17-cv-682-wmc
Dodge Correctional Institution,

                 Respondent.

## REPORT

Wisconsin state prisoner Jeffrey Lepsch is serving a life sentence after a La Crosse County jury found him guilty of two counts of first-degree intentional homicide, armed robbery by use of force, and possession of a firearm by a felon. After unsuccessfully appealing his conviction in the Wisconsin state courts, Lepsch now seeks federal habeas relief under 28 U.S.C. § 2254, on the following grounds: (1) he was denied his Sixth Amendment right to be tried by an impartial jury because two jurors, D.M. and J.A., did not swear that they could set aside their belief that police were generally more credible than other witnesses (Grounds 1 and 2 as stated in the Petition, dkt. #1); and (2) trial counsel was ineffective for failing to sufficiently examine and challenge these jurors for

cause (Ground 6 of the Petition).[1]  The petition has been referred to me by the presiding judge, William Conley, for report and recommendation.

As explained in more detail below, I conclude that Lepsch is not entitled to habeas relief on his claims because he has failed to meet his heavy burden of showing that the Wisconsin Supreme Court adjudicated them in a manner that was unreasonable or that contradicted clearly established federal law.  Accordingly, I am recommending that this court deny the petition.

FACTS[2]

**A.  State Trial Court Proceedings**

On September 15, 2012, police were dispatched to May's Photo, a camera store in La Crosse, Wisconsin.  The store owner and his son had been found dead of apparent gunshot wounds to the head, and more than $16,000 worth of camera equipment had been stolen.  Surveillance video, cell phone records, and vehicle records led police to Lepsch,

---

[1] This court initially authorized Lepsch to proceed on six claims, but he has abandoned two of them explicitly and one implicitly.  Lepsch has expressly abandoned Claims 3 and 5.  *See* Reply Br. (dkt. # 33) n.1.  I find that Lepsch has also abandoned Claim 4 -- that the trial court denied him due process and an impartial jury by providing him with only six peremptory strikes instead of the seven to which he was entitled under state law -- by failing to develop it in either of his briefs.  *Kramer v. Banc of Am. Sec., LLC*, 355 F.3d 961, 964 n.1 (7th Cir. 2004) ("We have repeatedly made clear that perfunctory and undeveloped arguments that are unsupported by pertinent authority, are waived.").  Regardless, that claim would fail insofar as it turns on Lepsch's argument that certain jurors were biased, which this court rejects herein.  *Jimenez v. City of Chicago*, 732 F.3d 710, 715-16 (7th Cir. 2013) ([A] possible error in administering peremptory challenges that did not deny an impartial jury does not warrant a new trial.").

[2] These facts, which are not in dispute, are drawn from the record of the state court proceedings, attached to the State's Answer at dkt. #13, and from the Wisconsin Supreme Court's decision on Lepsch's direct appeal.

who resided in Dakota, Minnesota, a town about 11 miles outside of La Crosse.  In a search of his residence, the police found various cameras and lenses with serial numbers matching the equipment stolen from May's Photo.  Later, the crime lab determined that a palm print found on one of the glass cases in May's Photo matched Lepsch's palm print.

In October, the State of Wisconsin charged Lepsch with: (1) two counts of first-degree intentional homicide; (2) armed robbery with use of force; and (3) possession of a firearm by a felon.  Because there were no eyewitnesses to the crime, law enforcement testimony was to be a central part of the State's case.

Before jury selection, prospective jurors were asked to fill out and return a juror questionnaire that posed dozens of questions on subjects ranging from the jurors' favorite television shows to the jurors' views on various legal propositions.  The questionnaires required a signature under the following statement: "I affirm, under penalty of perjury, that I have given complete and honest answers to all of the questions above."  One of the questions on the jury questionnaire read:

> You will be hearing testimony from several police officers in this case.  Do you think you would give police officers more credibility, less credibility or the same amount of credibility as other witnesses who were not police officers?

Potential jurors could answer this question one of three ways--(1) more credibility, (2) less credibility, or (3) the same credibility-- and there was space underneath in which to explain his or her answer.  Jurors J.A. and D.M. each checked "more credibility."  (Dkt. #13-7 at 27, 43.)  However, both J.A. and D.M. checked "No" on their questionnaires next to the question, "Is there any reason why you could not be impartial in this case?" (*Id.* at 30, 46.)  D.M. stated elsewhere on his questionnaire, "I believe in facts, not people."

(*Id.* at 28.) The parties agreed to excuse about two dozen prospective jurors at least in part based on the answers provided. Neither J.A. nor D.M. were among those excused.

On July 23, 2013, jury selection itself occurred. Certain prospective jurors were brought into the courtroom for individual questioning in the presence of the court, the prosecutors, and Lepsch, and his attorneys.[3] This led to a number of jurors being excused. Neither J.A. nor D.M. were among those excused. Next, the remaining prospective jurors were brought into the courtroom as a group and questioned in the presence of the court, Lepsch, and his attorneys. Finally, Lepsch and the State were each given six peremptory strikes and a panel of 15 jurors was selected.

During individual questioning of the venire panel, neither the court, the State, nor Lepsch's attorneys followed up with J.A. or D.M. about the statement on the questionnaire that they would generally find a police officer's testimony more credible than that of other witnesses. In response to questions on other matters, J.A. stated that while he had opinions, he understood that his personal opinions were not consistent with the beyond-a-reasonable-doubt standard, and he understood that he would have to set his opinions aside and decide the case on the evidence presented at trial. (Dkt. #13-7 at 50-51.) J.A. stated that he had experience as a juror and that he had been able to base his decision on the evidence in that case. (*Id.* at 51.) D.M. was asked about his response on the questionnaire indicating that he knew a lot of law enforcement officers. D.M. explained that he worked at an airport and knew a lot of airport police and fire personnel on a

---

[3] Lepsch was represented at trial by a team of three attorneys from the Wisconsin Public Defender's Office. His lead attorney, Vincent Rust, had 12 years of experience which included more than 20 jury trials.

professional level, but he denied having any personal relationships with anyone in law enforcement. (*Id*. at 36.)

Both J.A. and D.M. were present during questioning of the jurors as a group. Topics touched on during questioning by the defense were: (1) whether the police can make mistakes; (2) whether it is important that law enforcement follow procedures; (3) whether police "ever let bias get in the way of what they're looking for"; (4) whether "we tend to trust professionals [including police] a little more than we should sometimes"; and (5) how to determine whether a professional such as a police officer "has the right training or experience." (Tr. of Voir Dire (dkt. # 15) 224, 226, 229.)

Lepsch's counsel did not move to strike J.A. or D.M. for cause. Both ultimately sat on the jury, which returned a guilty verdict on all counts. The court later sentenced Lepsch to two life terms without the possibility of extended supervision on the homicide counts, 40 years' imprisonment for the armed robbery count, and 10 years' imprisonment for the possession of a firearm by a felon, all to be served consecutively.

## B. Post-Conviction Proceedings

### 1. Trial Court

Lepsch, represented by new counsel, filed a postconviction motion for a new trial, raising the following grounds: (1) Lepsch was denied his constitutional rights based on the manner in which the jury venire was sworn prior to jury voir dire; (2) biased jurors sat on the jury; (3) he was denied the proper number of peremptory strikes; and (4) trial counsel was ineffective for failing to object to the aforementioned errors. *State v. Lepsch*, 2016 WI

App 1, ¶ 4, 366 Wis. 2d 330, 873 N.W.2d 99, *aff'd*, 2017 WI 27, ¶ 4, 374 Wis. 2d 98, 892 N.W.2d 682.  With respect to his juror bias claim, Lepsch argued that nine of the jurors on the jury panel, including J.A. and D.M., displayed subjective bias by answering pre-voir dire jury questionnaires indicating beliefs that: (1) law enforcement witnesses were more credible than non-law enforcement witnesses; (2) suggested they had made up their minds as to Lepsch's guilt; and (3) disagreed with the presumption of innocence.  He contended that the voir dire of each of those nine jurors failed to support a finding that those jurors could set aside the belief suggested in the questionnaire answers, and thus the record showed that the jurors were objectively biased.  *Id*. at ¶ 9.

The circuit court held an evidentiary hearing on the motion on September 4, 2014. Under cross-examination by the state about the defense's jury selection strategy, Lepsch's trial counsel, Attorney Rust, testified that the defense team:

> Wanted jurors to be skeptical of professionals and police because there were forensic issues in this case that were important . . . We wanted people that would look at the theory of confirmation bias, that the police made up their mind early in the case; and . . . failed to do a thorough examination because they had made their minds up[.]

(Tr. of Evid. Hrg. (dkt. #13-22) 40:10-17.)  Counsel further testified that:

> the people that I didn't move to strike for cause answered and appeared to be genuine about – in – in the way they were talking to me about their intent to set aside any bias they had about stuff they'd seen in the media; and sometimes the way they said it was more a figure of speech, I think I can, which I took to mean them saying yes.

(*Id*. at 43:4-9.)

Under questioning by counsel for Lepsch, Rust acknowledged that he did not ask

D.M. about his questionnaire answer about police credibility.  Rust explained, however, that he had deliberately not done so because D.M.

> was someone that I thought might be favorable because he wrote on the questionnaire that he believes in facts and not – not in people, again keeping with the theme of objectivity rather than what people had – may or may not have come in with prior to the – the beginning of the evidence, if that make – if that answer made sense.

(*Id.* 23:1-7.)  As for J.A., Rust noted that he had also written on his questionnaire that he could be impartial, and that counsel believed from his answers on the questionnaire and to the judge's questions that J.A. could be objective.  (*Id.* at 15.)

The trial court denied the motion.  With respect to Lepsch's juror bias claim, the circuit court found:

> From the court's position of being able to best determine juror bias, the court is absolutely convinced that each juror was able to put any biases out of their minds.  The court is absolutely certain that Lepsch was tried by a fair and impartial jury who decided the case based solely on the evidence before them.  The court is unequivocally convinced that the jury agonized over its decision and gave Lepsch every benefit of the doubt.

(11/14/14 Dec. and Ord. (dkt. #1-1) 10.)  The court explained that it was convinced, "based on its experience during jury selection and at trial, that the jurors were subjectively able to put aside any potential biases," adding that simply because some jurors used "phrases that can seem equivocal when read in a transcript" was not enough to show objective bias.  *Id*.

The trial court concluded that because Lepsch had failed to demonstrate that the jurors who ultimately sat on his jury were subjectively or objectively biased, his ineffective assistance of counsel claim failed because Lepsch had not been prejudiced by counsel's

failure to object to the seating of those jurors.  Lepsch's claim also failed on the deficient performance prong, held the court, because Lepsch's attorneys came into jury selection "very well prepared and with a clear strategy," and "had very reasonable strategic reasons for the decisions they made during voir dire."  (*Id*. 19-20.)

### 2.  Wisconsin Court of Appeals and Wisconsin Supreme Court

Lepsch appealed his conviction and the order denying his post-conviction motion to the Wisconsin Court of Appeals, arguing, among other things, that: (1) he was entitled to a new trial because his jury included jurors who failed to provide "unequivocal assurances" that they could set aside prior opinions and return a verdict based solely on the evidence; (2) the trial court failed to provide Lepsch with the proper number of peremptory strikes; and (3) trial counsel was ineffective in failing to sufficiently examine and challenge prospective jurors for cause and in the use of peremptory strikes.  (Lepsch's Ct. of App. Br. (dkt. #13-2).)  The Wisconsin Court of Appeals rejected these arguments and affirmed the circuit court in an unpublished, per curiam opinion.  *Lepsch*, 2016 WI App 1.  Lepsch then petitioned the Wisconsin Supreme Court for review, raising essentially the same grounds he had raised before the Wisconsin Court of Appeals.  Granting review, the Wisconsin Supreme Court rejected Lepsch's claims and affirmed the court of appeals. *State v. Lepsch*, 2017 WI 27, 374 Wis. 2d 98, 107, 892 N.W.2d 682, 687.

Examining all of Lepsch's challenges to the composition of his jury through the lens of ineffective assistance of counsel, *id*. at ¶ 16, the Wisconsin Supreme Court determined that Lepsch's claims failed on the second part of the test for ineffective assistance as set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), because Lepsch had failed to

demonstrate that he was prejudiced by any of his lawyers' alleged errors.  With respect to Lepsch's claim that his attorneys were ineffective in failing to sufficiently examine and challenge certain prospective jurors for cause based on their answers to four questions on the pre-trial questionnaire, the court held that Lepsch "cannot establish ineffective assistance because he cannot prove either objective or subjective bias." *Id*. at ¶ 27.  The court noted that of the seven jurors who stated on the questionnaire that they would deem police officers more credible than witnesses who were not police officers, five jurors were specifically questioned on that answer and either the lawyers or the court elicited answers that established that the jurors could decide the case impartially.  *Id*.  In the Wisconsin Supreme Court's view, these answers provided ample reason to defer to the trial court's conclusion that these jurors were not biased when they sat on Lepsch's case.  *Id*.

As for J.A. and D.M., the two jurors who were *not* specifically questioned on this point, the court found "other aspects of the jury selection process" that provided support for the circuit court's finding that neither juror was biased.  *Id*. at ¶ 28.  Specifically, the court observed that:  (1) both J.A. and D.M. checked "No" on their questionnaires next to the question, "Is there any reason why you could not be impartial in this case?"; (2) D.M. stated elsewhere on his questionnaire, "I believe in facts, not people"; (3) both J.A. and D.M. were present during questioning of the jurors as a group, during which they "could not have failed to recognize that bias in favor of law enforcement officials was inappropriate" given the general tenor of voir dire and various questions asked by the defense concerning whether police can make mistakes; and (4) the State had told the jurors that "both sides want people who are fair, objective," and when asked whether anyone

thought they could not be fair, no juror answered.  *Id*. at ¶¶ 28-30 (internal citations omitted).

Finally, the Wisconsin Supreme Court rejected Lepsch's argument that reversal was required under *Patton v. Yount*, 467 U.S. 1025 (1984), merely because neither J.A. nor D.M. had provided a "final, unequivocal" swearing that he could set aside his beliefs about police credibility and decide the case solely on the evidence.  *Id*. at ¶ 33.  Although the court agreed with Lepsch that, as a general matter, a prospective juror must be able to "set aside any opinion he might hold and decide the case on the evidence," it disagreed that *Patton* established a bright-line constitutional rule or any "magic words" that a juror must say in order to be deemed impartial.  *Id*.  Accordingly, because Lepsch had not provided sufficient reason to upset the circuit court's determination that none of the jurors who sat on Lepsch's jury were biased, he could not demonstrate that he had been prejudiced by any alleged deficient performance by trial counsel during voir dire.  *Id*. at ¶ 37.

Lepsch now seeks federal habeas relief, asserting two, intertwined grounds for reversal of his conviction:  (1) the empaneling of jurors J.A. and D.M. deprived him of his Sixth Amendment right to a trial by an impartial jury; and (2) trial counsel's failure to either obtain an unequivocal declaration of impartiality from J.A. and D.M. or to move to strike either juror for cause deprived him of his Sixth Amendment right to effective counsel because it resulted in the seating of biased jurors.

ANALYSIS

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), habeas corpus relief for persons serving sentences imposed by state courts may not be

granted on any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).[4]

For purposes of 28 U.S.C. § 2254(d)(1), clearly established law as determined by [the Supreme] Court 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Yarborough v. Alvarado*, 541 U.S. 652, 660–61 (2004) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). A decision of the state court is an "unreasonable application" when "the state court identifies the correct governing legal rules from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407. A federal court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411. Under this deferential standard, we do not ask whether the state court's determination was incorrect, but rather whether fair-minded jurists could disagree about whether the state court's decision conflicts with existing Supreme Court caselaw. *Harrington v. Richter*, 562 U.S. 86, 101 (2011)).

---

[4] The court applies these standards to the decision of the last state court to adjudicate a given claim on the merits, in this case, the Wisconsin Supreme Court. *Williams v. Bartow*, 481 F.3d 492, 497-98 (7th Cir. 2007).

Further, state-court factual determinations must stand unless they are objectively unreasonable in light of the evidence presented in state court. 28 U.S.C. § 2254(d)(2); *Harrington*, 562 U.S. at 100. A federal habeas court may not characterize state-court factual determinations as unreasonable "merely because [we] would have reached a different conclusion in the first instance." *Brumfield v. Cain*, 576 U.S. 305, 135 S. Ct. 2269, 2277 (2015) (alteration in original) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). Finally, "a determination of a factual issue made by a State court shall be presumed to be correct," with the applicant bearing the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Specifically, as concerning this case, determinations of juror bias are factual determinations to which the presumption of correctness applies. *Wainwright v. Witt*, 469 U.S. 412, 426 (1985).

As a threshold matter, I address briefly respondent's argument that Lepsch has waived his ineffective assistance claim by failing to develop it in his briefs. Although respondent correctly notes that Lepsch does not cite *Strickland* and does not frame his arguments in terms of its two-part test, Lepsch argues that it can never be sound strategy for trial counsel to permit the seating of an obviously biased juror, and he cites a number of circuit cases holding to this effect. (Br. in Supp. (dkt. #25) 2 n.3.) In other words, Lepsch takes the position that his ineffective assistance and biased jury claims are one and the same: if J.A. or D.M. was actually biased, then it follows that his attorney was

ineffective under *Strickland* in failing to ask the court to strike either for cause.[5]   As the contours of Lepsch's ineffective assistance claim are plain from his opening brief, the court declines to find that he has abandoned it.

Indeed, Lepsch's claim of ineffective assistance of counsel is the *only* ground on which he could hope to obtain habeas relief on his claim that J.A. and D.M. were biased. That is because the United States Supreme Court has never held that a trial judge has an obligation to dismiss a juror for cause even if no lawyer objects.  *Cage v. McCaughtry*, 305 F.3d 625, 626 (7th Cir. 2002) (reversing its own grant of certificate of appealability on that ground, declaring it "not a ground upon which a state prisoner can obtain relief in a federal habeas corpus proceeding."); *Washington v. Thaler*, 714 F.3d 352, 355 (5th Cir. 2013) (holding same).  Certainly, the Court did not so hold in *Patton v. Yount*, 467 U.S. 1025, which is the legal linchpin on which Lepsch's entire habeas petition rests.

In *Patton*, the petitioner argued that he had been denied his right to an impartial jury at his retrial for first-degree murder and rape, arguing, first, that the jury as a whole was biased as a result of adverse pretrial publicity, and second, that one juror (Hrin) and two alternates had been erroneously seated over his challenges for cause.  After rejecting his first claim, the Supreme Court "briefly" considered the second, disagreeing with the Third Circuit that juror Hrin and the two alternates were erroneously seated over

---

[5] Respondent does not dispute Lepsch's contention that if his counsel permitted the seating of even one biased juror, Lepsch was prejudiced and would be entitled to a new trial.  *Parker v. Gladden*, 385 U.S. 363, 366 (1966) (If even one juror is biased, jury cannot be considered impartial); *Johnson v. Armontrout*, 961 F.2d 748, 755 (8th Cir. 1992) ("Trying a defendant before a biased jury is akin to providing him no trial at all. It constitutes a fundamental defect in the trial mechanism itself.").

petitioner's challenges for cause.[6] *Id*. at 1037.  In the Court's view, the federal appellate court had not given proper deference to the state trial court's determination that these jurors were impartial.  *Id*. at 1036-38.  Whereas the question whether the jury *as a whole* is impartial was a mixed question of law and fact, said the Court, that analysis did not apply to "a federal habeas corpus case in which the partiality of *an individual juror* is placed in issue."  *Id*. at 1036 (emphasis added).  In such cases, held the Court:

> [The] question is not one of mixed law and fact.  Rather, it is plainly one of historical fact:  did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed.

*Id*.  Applying that standard, the Court found that even though the three jurors challenged for cause had given somewhat inconsistent answers during *voir dire*, this ambiguity was insufficient to overcome the presumption of correctness owed to the trial court's findings. *Id*. at 1039-40.

As Lepsch reads *Patton*, the block-quoted statement above established a substantive test for juror impartiality that disqualifies any potential juror who expresses a prior belief but who is not asked -- and therefore does not "swear" -- during voir dire that he or she is able to set aside that belief and decide the case based on the evidence.  Like the Wisconsin Supreme Court, I disagree.  The alleged error before the *Patton* Court was the trial court's rejection of defense counsel's motion to strike certain jurors for cause.  *Id*.  Nothing in the decision suggests that the Court was imposing a burden upon trial courts to dismiss jurors

---

[6] The Court expressed skepticism whether the claim even was appropriate for review, given that two of the challenged jurors were alternates and it was doubtful whether Yount had properly raised a challenge to the third.  *Id*. at 1037.

*sua sponte*, as Lepsch suggests here.   To the contrary, after *Patton*, the Supreme Court affirmed that "in "any . . . trial situation where an adversary wishes to exclude a juror because of bias, then, it is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality," at which point it *then* becomes the "trial judge's duty to determine whether the challenge is proper."   *Wainwright*, 469 U.S. at 423.

If there had been any doubt as to whether *Patton* imposed a duty on trial judges to dismiss jurors for cause even if no lawyer objected, the Seventh Circuit removed that doubt in *Cage*, 305 F.3d at 626.   There, the court held that it had erred in granting a certificate of appealability on the question "whether [the petitioner] was denied his constitutional right to an impartial jury by the seating of a juror who provided potentially equivocal assurances of impartiality during voir dire" when defendant did not object to the seating of that juror.   As that court explained:

> This amounts to asking whether the judge has an obligation to dismiss a juror for cause even if no lawyer objects. In certifying this as an appealable question, we erred.  The Supreme Court has never announced such a rule, and so it is not a ground upon which a state prisoner can obtain relief in a federal habeas corpus proceeding . . . The absence of a case in the Supreme Court (or any other court, as far as we know) declaring such a rule is not surprising.  There is nothing suspicious about a lawyer's refusing to strike a prospective juror for cause . . . The lawyer might feel that on balance the juror was more likely to vote for than against his client.  A rule requiring the judge to exercise all challenges for cause would not serve criminal defendants and is hardly a plausible interpretation of the Sixth Amendment . . . let alone one endorsed by any decision of the Supreme Court.

*Id.*, 305 F.3d at 626-27 (internal citations omitted).

*Cage* makes clear that, insofar as Lepsch reads *Patton* to announce a new, *per se*, constitutional standard that requires a sworn declaration of impartiality from *all* venire persons, challenged or not, he reads the case too broadly.  As the Wisconsin Supreme Court properly concluded, although the test for juror impartiality remains whether the juror is one who "can lay aside his impression or opinion and render a verdict based on the evidence presented in court," *Irvin*, 366 U.S. at 723, the Constitution does not demand that this inquiry turn on any "magic words" that the juror must say.  *See Skilling v. U.S.*, 561 U.S. 358, 386 (2010) (noting that to ascertain juror impartiality, "the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula.") (quoting *United States v. Wood*, 299 U.S. 123, 145-46 (1936)).  Accordingly, in rejecting this claim in Lepsch's state court appeal, the Wisconsin Supreme Court did not adjudicate the claim in a manner that was contrary to or an unreasonable application of clearly established Supreme Court law.

Notwithstanding *Patton*, the burden remained on Lepsch to pose questions to J.A. and D.M. to expose any bias such that a challenge for cause would have been appropriate. Of course, Lepsch's trial counsel never challenged J.A. or D.M. for cause, much less exercised a peremptory strike to remove either from the jury; to the contrary, he concluded that J.A. and D.M. were two jurors that could be impartial.  While Lepsch concedes that not *all* preconceived notions or beliefs constitute bias, he insists that J.A. and D.M.'s statement on their questionnaire--that they would likely give police officers more credibility than other witnesses who were not police officers--was a "statement of actual bias" that demanded further exploration, and that counsel was ineffective for leaving them

on the jury without first obtaining a sworn declaration from both that they could set this bias aside and decide the case impartially.  Lepsch further argues that the Wisconsin Supreme Court made an unreasonable determination of fact when it determined that Lepsch had failed to show that either J.A. or D.M. was biased.

I disagree.  Even assuming for the sake of argument that it is *per se* ineffective for counsel to allow the empaneling of a juror who makes a statement of actual bias, "[t]here is a critical difference between a 'prior belief' in the Bayesian statistician's sense and 'bias' in the sense that requires disqualification of a juror or judge." *Thompson v. Altheimer & Gray*, 248 F.3d 621, 625 (7th Cir. 2001).  "Everyone brings to a case a set of beliefs that may incline him in one direction or another"; only when these beliefs are "irrational or unshakeable" must a prospective juror be found unable to faithfully and impartially apply the law.  *Id*.; *see also Irvin v. Dowd*, 366 U.S. 717, 722-23 (1961) (impartial juror is one who can lay preconceived opinions aside "and render a verdict based on the evidence presented in court.").  Thus, in *United States v. Ricketts*, 146 F.3d 492 (7th Cir. 1998), the court held that the mere expression by certain jurors that they would tend to believe prison guards more than inmates was

> woefully short of establishing support for a factual finding that the questioned jurors were not going to be impartial. In the abstract, it is certainly not unreasonable for an ordinary person to say she would generally tend to believe a prison guard over a prison inmate. But that certainly doesn't mean that in a given case, after hearing sworn testimony under oath and considering all the facts and circumstances, that that same juror would automatically believe a given guard over a given inmate. Generalized questions of the sort asked here are a slim basis upon which to base a challenge for cause.

*Id*. at 495-96; *see also Griffin v. Bell*, 694 F.3d 817, 823 (7th Cir. 2012) (trial court did not

abuse its discretion in declining to strike for cause a juror who said that her first inclination, if faced with conflicting stories from a police officer and a 14-year-old boy, would "most likely" be to believe the officer, where juror never said she could not be fair); *but see Thompson*, 248 F.3d at 626 (trial court erred in declining to strike for cause juror who expressly said that her prior experience would cloud her judgment, where court had failed to ask the juror whether she could relinquish those beliefs and suspend judgment until she heard all the evidence).

As in *Ricketts*, all Lepsch offers in support of his claim that J.A. and D.M. were biased is their single statement, offered in the abstract, that they would generally tend to believe police officers more than other witnesses. As the Wisconsin Supreme Court properly determined, this was not enough to establish bias. Notably, there was ample evidence in the record to suggest that J.A. and D.M. would *not* automatically give more weight to the police officers who testified in Lepsch's case but instead would judge the case impartially based on all of the evidence presented in court. Specifically: (1) both J.A. and D.M. checked "No" on their questionnaires next to the question, "Is there any reason why you could not be impartial in this case?"; (2) D.M. stated elsewhere on his questionnaire, "I believe in facts, not people"; (3) during individual voir dire, J.A. testified that he understood that while he had opinions, he understood that his opinions were not consistent with the beyond a reasonable doubt standard, and that he had been a juror in a previous case and had been able to set his opinions aside; (4) both J.A. and D.M. were present during questioning of the jurors as a group, during which they "could not have failed to recognize that bias in favor of law enforcement officials was inappropriate" given

the general tenor of voir dire and various questions asked by the defense concerning whether police can make mistakes; and (5) the State had told the jurors that "both sides want people who are fair, objective," and when asked whether anyone thought they could not be fair, no juror answered.  Moreover, after observing J.A. and D.M.'s body language and hearing their answers to questions, neither trial counsel nor the trial court saw any reason to suspect that J.A. and D.M. would not be impartial jurors.  All of this evidence amply supports the Wisconsin Supreme Court's conclusion that Lepsch failed to meet his burden to show that J.A. or D.M.'s general beliefs about police credibility were so irrational or unshakeable that they would be unable to put them aside and judge the case based on the evidence.  Lepsch has come forth with *no* evidence, much less evidence that is clear and convincing, to rebut the presumption of correctness to which the Wisconsin courts' factual determination that J.A. and D.M. were not biased is entitled.  *See* 28 U.S.C. § 2254(d)(2).

In the end, Lepsch's "evidence" of bias merely circles back to his claim that J.A. and D.M. were biased as a matter of law under *Patton* because they did not "affirmatively swear" that they could decide the case impartially despite their general belief that police officers tend to be more credible than other witnesses.  As previously explained, the Wisconsin Supreme Court was correct to conclude that the Constitution does not impose such a rigid test.  As such, Lepsch cannot meet his heavy burden of showing that he is entitled to habeas corpus relief.

Finally, even if this court were to agree with Lepsch that bias might be inferred from J.A. and D.M.'s questionnaire response, trial counsel's decision not to seek more explicit assurances of impartiality from these jurors would be entitled to deference under *Strickland*.

In *Cage*, the Seventh Circuit upheld the attorney's decision not to seek an assurance of impartiality from a juror who made statements implying possible bias, where the lawyer explained that he thought the juror was trying to get off having to serve on the jury, and that if he were left on against his will he would blame the government, which had instituted the case, and therefore would be inclined to vote for an acquittal.  305 F.3d at 626.  The Seventh Circuit rejected Cage's claim that his lawyer had been ineffective: "[Cage's] lawyer had a tactical reason for his action, and it was not so far off the wall that we can refuse the usual deference that we give tactical decisions by counsel to waive a right of his client that he thinks would if asserted reduce the likelihood of the client's being acquitted."  *Id*. at 627 (citations omitted); *accord United States v. Lathrop*, 634 F.3d 931, 938 (7th Cir. 2011) (citing *Cage* for the proposition that trial strategy can justify an attorney's decision "not to seek an assurance of impartiality from a juror, even after a juror has made statements implying possible bias," so long as counsel's reasons for not questioning further "were not so far off the wall" that deference should be declined).

Here, counsel explained at the post-conviction motion hearing that he determined from the entire *voir dire* proceeding that, despite their questionnaire responses, J.A. and D.M. likely would be objectively receptive to the notion that the police might have applied confirmation bias in focusing on Lepsch as the prime suspect in the May Photo murders, and therefore were more likely to vote for acquittal.  As in *Cage* and *Lathrop*, counsel's reasons for opting not to question either juror further about his questionnaire response or to seek his removal was not "so far off the wall" that *Strickland* deference would not apply, particularly where both jurors swore that they could be impartial.

In sum, Lepsch's claim that *Patton* dictates a different result than found by the Wisconsin Supreme Court rests on a faulty legal foundation, and he lacks any facts to surmount his heavy burden of overcoming the deference owed to the Wisconsin Supreme Court's determination that J.A. and D.M. were not biased jurors.   Accordingly, I recommend that his petition for habeas relief be denied.


RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1)(B), I respectfully recommend that Jeffrey Lepsch's petition for a writ of habeas corpus under 28 U.S.C. § 2254 be DENIED.

Entered this 2nd day of August, 2022.


BY THE COURT:

/s/
_____
STEPHEN L. CROCKER
Magistrate Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
120 N. Henry Street, Rm. 540
Madison, Wisconsin  53703

Chambers of
STEPHEN L. CROCKER
U.S. Magistrate Judge

Telephone
(608) 264-5153 August 2,
2022

Steven Zaleski
Zaleski Law Firm
10 E. Doty St., Ste. 800
Madison, WI  53703

Lisa E. F. Kumfer
Wisconsin Dept. of Justice
17 W. Main Street
P.O. Box 7857
Madison, WI  53707-7857

Re:   Lepsch, *et al*. v. Pollard
      Case No. 17-cv-682-wmc

Dear Counsel:

The attached Report and Recommendation has been filed with the court by the United States Magistrate Judge.

The court will delay consideration of the Report in order to give the parties an opportunity to comment on the magistrate judge's recommendations.

In accordance with the provisions set forth in the memorandum of the Clerk of Court for this district which is also enclosed, objections to any portion of the report may be raised by either party on or before August 16, 2022, by filing a memorandum with the court with a copy to opposing counsel.

If no memorandum is received by August 16, 2022, the court will proceed to consider the magistrate judge's Report and Recommendation.

Sincerely,
/s/
Connie A. Korth
Secretary to Magistrate Judge Crocker

Enclosures

## MEMORANDUM REGARDING REPORTS AND RECOMMENDATIONS

Pursuant to 28 U.S.C. § 636(b), the district judges of this court have designated the full-time magistrate judge to submit to them proposed findings of fact and recommendations for disposition by the district judges of motions seeking:

      (1) injunctive relief;

      (2) judgment on the pleadings;

      (3) summary judgment;

      (4) to dismiss or quash an indictment or information;

      (5) to suppress evidence in a criminal case;

      (6) to dismiss or to permit maintenance of a class action;

      (7) to dismiss for failure to state a claim upon which relief can be granted;

      (8) to dismiss actions involuntarily; and

      (9) applications for post-trial relief made by individuals convicted of criminal offenses.

Pursuant to § 636(b)(1)(B) and (C), the magistrate judge will conduct any necessary hearings and will file and serve a report and recommendation setting forth his proposed findings of fact and recommended disposition of each motion.

Any party may object to the magistrate judge's findings of fact and recommended disposition by filing and serving written objections not later than the date specified by the court in the report and recommendation. Any written objection must identify specifically all proposed findings of fact and all proposed conclusions of law to which the party objects and must set forth

with particularity the bases for these objections.  An objecting party shall serve and file a copy of the transcript of those portions of any evidentiary hearing relevant to the proposed findings or conclusions to which that party is objection.  Upon a party's showing of good cause, the district judge or magistrate judge may extend the deadline for filing and serving objections.

After the time to object has passed, the clerk of court shall transmit to the district judge the magistrate judge's report and recommendation along with any objections to it.

The district judge shall review de novo those portions of the report and recommendation to which a party objects.  The district judge, in his or her discretion, may review portions of the report and recommendation to which there is no objection. The district judge may accept, reject or modify, in whole or in part, the magistrate judge's proposed findings and conclusions.  The district judge, in his or her discretion, may conduct  a hearing, receive additional evidence, recall witnesses, recommit the matter to the magistrate judge, or make a determination based on the record developed before the magistrate judge.

**NOTE WELL: A party's failure to file timely, specific objections to the magistrate's proposed findings of fact and conclusions of law constitutes waiver of that party's right to appeal to the United States Court of Appeals.  *See United States v. Hall,* 462 F.3d 684, 688 (7th Cir. 2006).**